**Marvin W. BROWN, Appellant,**

v.

**GASTON COUNTY DYEING MACHINE COMPANY, Appellee.**

**No. 71–1268.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1971.

Decided March 28, 1972.

Rehearing En Banc Denied May 22, 1972.

Robert Belton, Charlotte, N. C., (J. LeVonne Chambers, Charlotte, N. C., Conrad O. Pearson, Durham, N. C., Jack Greenberg, William L. Robinson, New York City, and Chambers, Stein, Ferguson, & Lanning, Charlotte N. C., on brief), for appellant.

Brown Hill Boswell, Charlotte, N. C. (J. W. Alexander, Jr., Blakeney, Alexander, & Machen, Charlottte, N. C., on brief), for appellee.

Before CRAVEN and BUTZNER, Circuit Judges, and DUPREE, District Judge.

BUTZNER, Circuit Judge:

This is an appeal from the district court's dismissal of an individual claim and class action alleging racial discrimination in hiring, promotion, pay, and other terms and conditions of employment.[1] The suit is founded on Title VII, § 703(a) of the Civil Rights Act of 1964,[2] and 42 U.S.C. § 1981, derived

---

1. Brown v. Gaston County Dyeing Machine Co., 325 F.Supp. 541 (W.D.N.C.1970). This case was previously here on appeal of the issue of exhaustion of remedies. Brown v. Gaston County Dyeing Machine Co., 405 F.2d 887 (4th Cir. 1968), cert. denied, Pilot Freight Carriers, Inc. v. Walker, 394 U.S. 918, 89 S.Ct. 1189, 22 L.Ed.2d 451 (1969).

2. Section 703(a) of the Act, 42 U.S.C. § 2000e-2(a) (1970), provides:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual

from the Civil Rights Act of 1866.[3] We modify the judgment concerning the individual claim, vacate the judgment dismissing the action brought on behalf of the class, and remand the case for further proceedings.

## I

The defendant, Gaston County Dyeing Machine Co., manufactures and installs custom-made machines for dyeing textile yarns or threads under high pressure. The machines, essentially large vessels weighing several tons with numerous fittings and connections, are assembled by welder-fabricators who must be able to read blueprints and weld to exacting tolerances. Welder-fabricators are among the company's best paid employees.

Marvin Brown, the individual plaintiff, claims that he was denied promotion to higher paying welder-fabricator classifications because he is black. The company counters that Brown was offered unfettered opportunity to advance, but that he lacked the ability and temperament to do the work required of him. Resolution of these conflicting claims depended largely upon the credibility of witnesses, and since the district judge's findings are supported by the evidence, they are binding upon us. Fed.R.Civ.P. 52(a).

In 1960, Brown, who had finished a welding course at North Carolina Agricultural and Technical College, was hired by the company for one of its lower paying jobs. The district judge found that

"Brown asked for employment as a welder and was given to understand by supervisory people that it was premature to try to place a Negro in a job as welder with the defendant.

"However, in 1961, [the company's president] instructed his plant managers to give Brown a job as a welder and try to help him make progress in that work. . . ." 325 F.Supp. at 542.

The president's directions were followed and Brown was promoted to welder-trainee. He then progressed through various steps to welder-fabricator, class B.

■ The district judge's findings establish that the company violated 42 U.S.C. § 1981 by denying Brown a welding job because of his race from the time he applied in 1960 until he was employed as a welder-trainee in 1961. Brown, therefore, is entitled to back pay measured by the difference between the wages he would have earned had he been initially employed as a welder-trainee and his actual wages. Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir.), cert. denied, United Order of Am. Bricklayers and Stone Masons, Local 21 v. Waters, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

■ The district judge, for reasons fully stated in his opinion, found that Brown was not a victim of racial discrimination after he was employed as a welder-trainee. This finding also depended largely upon the credibility of witnesses. It, too, is supported by the record and is binding upon us. Since this finding covers the period Brown worked for the company after the effective date of the Civil Rights Act of 1964,

of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

3. 42 U.S.C. § 1981 provides:
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

he is not entitled individually to the relief he seeks under Title VII of the Act, and his remedy is limited to § 1981 for the earlier period.

## II

While Brown has not proved his own Title VII claim, the class of employees he represents is not for this reason deprived of a remedy. Parham v. Southwestern Bell Telephone Co., 433 F. 2d 421, 428 (8th Cir. 1970); cf. Jenkins v. United Gas Corp., 400 F.2d 28, 31 (5th Cir. 1968). The district court, cognizant of this rule, considered the class action on its merits. Rejecting the company's claim that the evidence demonstrates no discrimination against minorities, the district court said, "[A]t least in prior years, welding and high pay in the defendant's shop were not for black men." 325 F.Supp. at 543. However, it found that the company, possibly spurred by this suit, had recently undertaken a number of measures to eliminate the racial discrimination it practiced in the past. Consequently, the court dismissed the action for lack of evidence to support relief for the class.

Although the company has employed black workers for many years in low paying jobs, it was not until 1961, when Brown was promoted to welder-trainee, that any had been assigned to welding. From 1958 to 1968, the company offered an after-hours training program for welding, blueprint reading, and shop math. Only one black employee was admitted to the program in that decade. For at least six years, it has employed three black leadmen, but these three are paid less than other leadmen who are white. The company advertises that it is an "equal opportunity employer," but it has no objective, formal guidelines for hiring, promotion, and transfer, or for giving notice of vacancies within the plant except by word of mouth.

Starting in the late 1950's, the company integrated its facilities, sports, and social functions. Since 1965 it has made affirmative efforts to recruit black workers as a part of its routine employment procedure, and it has provided opportunities for black employees to transfer into welder-fabricator or machine shop classifications. Some have accepted the transfers; others, after initially accepting, returned at their own request to lower paying jobs.

The district court found that Gaston County where the defendant's plant is located, has a black population of approximately 13 percent. In September 1969, black employees constituted less than ten percent of the defendant's total work force. As of the same date they comprised approximately 13 percent of the hourly rate production employees, but this percentage had slipped to less than 11 percent by the time of the trial in October 1970. The following table shows employment by race in each of the company's job classifications of hourly rate production employees as of September 1969:

| JOB CLASSIFICATION | HOURLY WAGE RANGE | No. of Employees in Each Category by Race | |
|---|---|---|---|
| | | BLACK | WHITE |
| Machine Erector | $2.21–3.81 | — | 9 |
| Inst. Test Technician | 3.02–3.47 | — | — |
| Electronics Technician | 2.78–3.47 | — | 2 |
| Layout and Leadman | 2.35–3.47 | 3 | 5 |
| Control Panel Technician | 2.91–3.36 | — | 1 |
| Machine Specialist | 2.91–3.36 | — | 2 |
| Fabrication Specialist | 2.91–3.36 | — | 1 |
| Machine Builder | 2.78–3.36 | — | 12 |

| JOB CLASSIFICATION | HOURLY WAGE RANGE | No. of Employees in Each Category by Race | |
| --- | --- | --- | --- |
| | | BLACK | WHITE |
| Pump Builder | 2.54–3.36 | – | 2 |
| Laboratory Machine Builder | 2.12–3.36 | – | 2 |
| Maintenance Mechanic | 1.60–3.36 | – | 3 |
| Welder-Fabricator, Class A | 2.92–3.25 | – | 19 |
| Machinist, Class A | 2.81–3.25 | – | 20 |
| Press Brake Operator | 1.60–3.25 | – | 3 |
| General Fabricator | 1.60–3.25 | – | 4 |
| Marvel Saw Operator | 1.60–3.08 | – | 1 |
| Instrument Bldr., Class A | 2.65–3.05 | – | 2 |
| Control-Panel Assembler | | | |
| Class A | 2.65–3.05 | – | 4 |
| Class B | 1.60–2.64 | – | 10 |
| Welder-Fabricator, Class B | 2.24–2.91 | – | 23 |
| Power Shear Operator | 1.60–2.87 | – | 2 |
| Radial Drill Press Operator | | | |
| Class A | 2.41–2.82 | – | 3 |
| Class B | 1.60–2.40 | – | – |
| Machinist, Class B | 2.18–2.80 | 1 | 9 |
| Shipping and Receiving Clerk | 1.60–2.80 | – | 6 |
| Machine Operator | 2.07–2.71 | – | 5 |
| Dye Spindle Bldr. | 1.60–2.67 | – | 3 |
| Forming-Press Operator | 1.60–2.67 | – | – |
| Stockman | 1.60–2.67 | – | 6 |
| Instrument Bldr., Class B | 1.60–2.64 | – | 2 |
| Painter | 1.60–2.64 | 2 | – |
| Sandblaster | 1.60–2.58 | 4 | – |
| Polisher-Finisher | 1.60–2.58 | 1 | – |
| Pump Bldr. Trainee | 1.60–2.53 | – | – |
| Carpenter-Crater | 1.60–2.52 | – | 2 |
| Truck Driver | 1.60–2.52 | 2 | 2 |
| Grinding and Pickling Optr. | 1.60–2.35 | 6 | 1 |
| Materials Handler | 1.60–2.35 | 1 | 3 |
| Maintenance/Industrial | | | |
| Clean up | 1.60–2.35 | 6 | 1 |
| Machine Operator Trainee | 1.60–2.27 | – | – |
| Welder-Fabricator Trainee | 1.60–2.23 | 1 | 13 |
| Machinist Trainee | 1.60–2.17 | – | – |
| Maintenance-Office | 1.60–2.13 | 2 | – |
| Watchman | 1.60–2.13 | – | – |
| General Helper | 1.60–2.13 | – | 4 |
| TOTALS | | 29 | 187 |

Analysis of these statistics shows that of the 45 job classifications, black workers are employed in only 11. Slightly less than half of these employees are relegated to two positions, grinding and pickling, and industrial maintenance

(janitors). Both of these jobs are rated near the bottom of the company's pay scale, and neither affords employees much opportunity for advancement to higher paid positions. Significantly, both of these classifications are almost completely segregated. Each has six black employees and only one white employee. Sandblaster is the classification of another comparatively low paying job, and it, too, is filled by black employees. In contrast, although 55 persons are employed in welding jobs, only one is black. And in the top 18 classifications having a pay range exceeding $3.00 an hour, there are 102 white and three black employees. But even these three, who are classified as leadmen, receive less than $3.00 an hour while their white counterparts are paid at a rate in excess of $3.00.

■ Courts have often observed that proof of overt racial discrimination in employment is seldom direct. *E. g.*, United States v. Jacksonville Terminal Co., 451 F.2d 418, 442 (5th Cir. 1971); Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157, 1162 (8th Cir. 1971); Holland v. Edwards, 307 N.Y. 38, 45, 119 N.E.2d 581, 584 (1954). Recognizing this, we have found "error in limiting Title VII to present specific acts of racial discrimination," United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970), and it is now well established that courts must also examine statistics, patterns, practices and general policies to ascertain whether racial discrimination exists. United States v. Jacksonville Terminal Co., 451 F.2d 418, 442 (5th Cir. 1971); Graniteville Co. v. EEOC, 438 F.2d 32, 41 (4th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247

(10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970); United States v. Hayes International Corp., 415 F.2d 1038, 1044 (5th Cir. 1969). We need not decide whether the 1969 statistics, revealing as they are, should be regarded as conclusively showing violation of Title VII or whether they establish a prima facie case.[4] It is sufficient to hold that they have not been rebutted by the company's efforts since 1965 to hire and promote black employees.

In United States v. Bethlehem Steel Corp., 446 F.2d 652, 655 (2nd Cir. 1971), the court identified the lack of "fixed or reasonably objective standards and procedures for hiring" as a discriminatory practice. Gaston's employment policies suffer the same deficiency. The company lacks objective guidelines for hiring, for pay increases within job classifications, and for promotion or transfer from one job to another. Employment and promotion policies that operate without objective standards for the direction of supervisory personnel may appear impartial, but recently we cautioned: "Practices, policies or patterns, even though neutral on their face, may operate to segregate and classify on the basis of race at least as effectively as overt racial discrimination. Particularly is this so if a history of past discrimination is developed." United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970). Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted. "Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex

---

4. *Compare* Parham v. Southwestern Bell Telephone Company, 433 F.2d 421, 426 (8th Cir. 1970) (statistics as a matter of law establish a violation of Title VII), *with* Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971) (statistics create a prima facie case of discrimination). *See* Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1154 (1971).

become irrelevant." Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971).

Here, in the absence of objective criteria applied to all workers alike, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by black employees. The proof discloses no objective standards based on education, experience, ability, length of service, reliability, or aptitude to account for the preferential employment of white workers. Cf. United States v. Jacksonville Terminal Co., 451 F.2d 418, 449 (5th Cir. 1971).

Moreover, the record discloses that notices of vacancies are not posted, and news of them is passed along by word of mouth. When job classifications are as segregated as they are in this company, delay in learning about a vacancy in an all white category may in itself discriminate against a black employee who hears of it only after it has been filled. This practice resembles the lack of a formal transfer system which we criticized in *Dillon*. 429 F.2d at 802, 804. It differs little from a hiring policy of referral by employees that has been condemned because it favors the family and friends of white employees over black job seekers who have no way of knowing about an opening. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123, 137 (8th Cir. 1969); *see* Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L. Rev. 1109, 1152 (1971).

■ In sum, the lack of objective guidelines for hiring and promotion and the failure to post notices of job vacancies are badges of discrimination that serve to corroborate, not to rebut, the racial bias pictured by the statistical pattern of the company's work force.

III

The district court was impressed with the efforts of the company to remedy the discrimination of prior years. Counsel for the plaintiff, though pressing for full injunctive relief, candidly acknowledges that the company has recently improved many of its practices. But the transition to a shop free from discrimination is as yet incomplete. Progress already made has chiefly occurred since the institution of this suit. If this litigation is prematurely terminated, members of the class run the risk that this progress will abruptly end. Therefore, we will adopt the remedy fashioned in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 428 (8th Cir. 1970), which the plaintiff somewhat reluctantly proposes as an alternative measure. There the court of appeals directed the district judge to retain the case on his docket a reasonable time to insure continuance of the company's policy of equal employment opportunities.

Accordingly, the case is remanded to the district court for retention on its docket for a reasonable time. If, at the end of this period, the court finds that the company's employment policies have completely eliminated the unlawful practices prohibited by § 703(a), it may dismiss this action. However, if any unlawful employment practices remain, the court must order appropriate injunctive relief. In either event, the plaintiff is entitled to recover his costs and reasonable counsel fees. Robinson v. Lorillard Corp., 444 F.2d 794 (4th Cir. 1971); Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971); *Parham, supra*, 433 F.2d at 429.

The judgment is affirmed in part, vacated in part, and the case is remanded for further proceedings consistent with this opinion.

DUPREE, District Judge (concurring in part, dissenting in part):

On the basis of a district court finding that plaintiff Brown upon asking

defendant for employment as a welder was told "that it was premature to try to place a Negro in a job as a welder with the defendant" the majority opinion rules that defendant violated a century-old civil rights statute, 42 U.S.C. § 1981, and thereby became liable to the plaintiff as a matter of law for back pay from the time of his initial employment in 1960 until he was given a job as a welder-trainee in 1961. I believe this result is not commanded by this statute and that in any event the decision should not be made in this court. I therefore respectfully dissent from this part of the majority opinion and in view of the far-reaching consequences of the decision in this rapidly-developing area of the law, I feel that my opposing views should be recorded.

For purposes of discussion I will assume that the evidence supported and the district court made a positive finding of racial discrimination by defendant against the plaintiff prior to his employment as a welder-trainee in 1961.[1] I agree with the majority that the evidence amply supported the district judge's findings that thereafter defendant did not discriminate against the plaintiff and that plaintiff's claims under Title VII of the Civil Rights Act of 1964 were properly rejected. But I seriously question whether the court-fashioned remedy of back pay should be inexorably employed in a Section 1981 case involving racial discrimination in employment which occurred prior to the enactment of Title VII. I think there are compelling reasons why it should not be so used.

Cited by the majority in support of the back pay award in this case are two cases from the Fifth Circuit and one from the Seventh.[2] These cases hold that Section 1981 affords a right

---

1. Actually, the evidence was not all one way on this point. The plaintiff, Marvin Brown, son of a long-time Negro employee of the defendant company, began working for defendant during vacation time while he was still in high school. Hubert Craig, Sr., the company's president and owner, took a special interest in the plaintiff, encouraged him to go to college and helped finance a two-year welding course for him at A & T College in Greensboro, North Carolina. Upon completion of this course plaintiff returned to Gastonia and went to work full-time for defendant in June, 1960. He asked for employment as a welder, a job which paid more money, but the record is not clear as to whether there were any such jobs open at the time. Plaintiff also asked to be allowed to take a basic welding course offered by the company, and he complained when defendant's plant manager failed to make room for him to take the course. The manager explained that only elementary welding and shop math were taught in the course and that plaintiff had already successfully completed these courses in his college training.

Later the defendant's president again intervened on his behalf and instructed the plant manager to give plaintiff the first welder-fabricator trainee job that came open. This was done and arrangements were made for defendant's best instructor in welder-fabricating to teach plaintiff this highly-skilled work. Defendant's personnel director was instructed to follow plaintiff's progress and to make sure he was given opportunity to improve and receive merit raises as he became qualified.

Brown worked for defendant about four and one-half years during which time he progressed "at least as good as average among the welders in the plant" and qualified for thirteen pay raises. His work was not always of acceptable quality, however, and there was evidence of friction between him and defendant's supervisory personnel from time to time. Finally he quit his job voluntarily in January, 1966 and he instituted this suit on May 31, 1966.

After leaving defendant's employment plaintiff took a welding job with another company, but was later fired because of poor quality work, refusal to follow instructions, and disobedience of instructions. The picture emerges of a malcontent who experienced difficulty in adjusting to the requirements of employment quite apart from any racially-discriminatory policies of his employer. The district court so found. 325 F.Supp. 541, 543 (1971).

2. Boudreaux v. Baton Rouge Marine Contracting Company, 437 F.2d 1011 (5th Cir. 1971) ; Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970) ; cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28

to sue for "private" racial discrimination in employment and that this right was not repealed by the enactment of Title VII of the Civil Rights Act of 1964. Other courts have reached the same conclusion.[3] None of these cases involved an award of back pay for a violation of Section 1981 which occurred prior to Title VII, however, and diligent research has failed to unearth such a case. Since Section 1981 for the first one hundred years of its existence was construed to apply only to state action and not to affect dealings between private individuals, this paucity of precedent is readily understandable.

The extension of Section 1981 to cover private employment contracts had its genesis in the celebrated case of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), a case decided over two years after this one was instituted and eight years after defendant's alleged violation of Section 1981. In holding that Section 2 of the Civil Rights Act of 1866 (now 42 U.S.C. § 1982) barred racial discrimination by private individuals in the sale or rental of property the Supreme Court in *Jones* rejected as dictum its previous pronouncements which had led to the general understanding of the scope of these statutes and expressly overruled Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906), to the extent it suggested a contrary holding. With unerring logic the courts began treating this "quickening of the statutory Lazarus" (Section 1982) as necessarily reviving its companion, Section 1981, and

making it applicable to racial discrimination in purely private contracts of employment. Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970).

As indicated, this court is the first one to apply the new rule retrospectively in a back pay claim. The result is that the defendant is required to pay damages for conduct which was not unlawful under the law as it existed at the time of the alleged wrong—a liability which the most learned attorneys would not have been able to counsel defendant against at the time. While the court undoubtedly has the power to give retroactive effect to an overruling decision[4] (which *Jones* effectively was in this context), I think to do so in this case works an unnecessary injustice.

It must be remembered that the federal statutes prescribe no specific remedies for violations of the Civil Rights Act of 1866. Thus the courts in the exercise of their equitable powers are left to "fashion" their own remedies. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). But surely this power to order a defendant to pay wages for a job never performed includes the power to exempt from such liability an employer who was not in violation of any known law at the time the alleged liability was being incurred.

At the very least the case should be remanded to the district judge for the purpose of determining whether in his discretion the new law should be applied retroactively to award the plain-

L.Ed.2d 231 (1971); and Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir. 1970), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

3. See, for instance, Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3rd Cir. 1971); Tolbert v. Daniel Construction Company, 332 F.Supp. 772 (D.S.C.1971); Jamison v. Olga Coal Co., 335 F.Supp. 454 (S.D.W.Va.1971).

4. See Legg's Estate v. Commissioner of Internal Revenue, 114 F.2d 760, 764 (4th

Cir. 1940). The rule is subject to several exceptions. It has been held not to apply in cases where there has been justifiable reliance on decisions which are subsequently overruled and those who have so relied may be substantially harmed if retroactive effect is given to the overruling decision; where the purpose of the overruling decision can be achieved without giving it retroactive operation; or where retroactive operation might greatly burden the administration of justice. Annot., 10 A.L.R.3d 1371. I think all of these exceptions are applicable here.

tiff in this case back pay.[5] Authority for this position is to be found in a decision of this court just published, Tillman v. Wheaton-Haven Recreation Association, Inc., 451 F.2d 1211 (4th Cir. 1971). In that case Chief Judge Haynsworth, while recognizing that the Civil Rights Act of 1866 was not impliedly repealed by the enactment of the Civil Rights Act of 1964, applied the salutary principle of statutory construction that where two statutes relate to the same thing they must be read as together constituting one law and should be harmonized and effect given to each, if possible. The private club exception in the public accommodations section of the 1964 Act was held to operate as an exception to the Act of 1866 as well.

And so it is here. The 1964 Act makes an award of back pay discretionary with the trial court.[6] In order to harmonize this provision with the construction now being placed on Section 1981 it should be held to operate as a limitation on that statute and to vest in the district court the power to award or withhold back pay in its sound discretion. In this view it may fairly be said that the district judge has already exercised his discretion to deny this plaintiff back pay under Section 1981, and his judgment in this respect should be affirmed.

Additionally, if Section 1981 is to be given retroactive effect, then in fairness it seems to me that the defendant should be allowed to move for leave to amend its answer to plead the statute of limitations, and this motion, too, would be addressed to the discretion of the district judge.[7]

Finally, if the result reached by the majority is permitted but not required by the law as now construed, I think this is not a case in which this court or the district court should exercise a

---

5. There is nothing in the opinion of the district judge to indicate that he considered the possible applicability of Section 1981 to this case. It is not likely that the question was even raised, for at the time the case was tried, only the *Waters* case from the Seventh Circuit had been decided, and it was then pending in the Supreme Court on petition for certiorari. The Fifth Circuit cases of *Boudreaux* and *Sanders* had not been decided. The question seems to have been raised for the first time in plaintiff-appellant's brief filed in this court and defendant apparently did not deem the point of sufficient merit to warrant a response in its brief.

6. 42 U.S.C. § 2000e–5(g) reads in part as follows:
"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, *with or without back pay* . . . ." (Emphasis added.)
In addition, Title VII contains provisions for conciliation through EEOC and certain time limitations. An award of attorneys fees is made discretionary. One

court has already held that the provisions of Title VII may be intentionally bypassed by a Section 1981 plaintiff. Caldwell v. National Brewing Company, 443 F.2d 1044 (5th Cir. 1971). If this be the law, one wonders if any future plaintiff will bother to comply with the ritual prescribed by Title VII where limitless relief is available under Section 1981.

7. In view of the state of the law at the time the action was instituted defendant's failure to plead the statute initially is excusable. Plaintiff's claims under Title VII were clearly not barred, and Jones v. Alfred H. Mayer Co. which gave rise to the change in the law with respect to Section 1981 claims had not been decided.
Since there is no federal statute of limitations prescribed for claims under Section 1981, the law of North Carolina would apply. 42 U.S.C. § 1988. Whether this would be the three-year statute, N.C. G.S. 1–52(2), or the ten-year statute, N.C.G.S. 1–56, poses an interesting question as to which I express no opinion. See Lazard v. Boeing Co., 322 F.Supp. 343 (E.D.La.1971). The claim would be barred under the three-year statute, but if the ten-year statute applies, the floodgates will be open to suits under Section 1981 in North Carolina on claims some of which may antedate Title VII by as much as three years.

discretion to award this plaintiff back pay. In the few short years the Civil Rights Act of 1964 has been in effect much progress has been made in achieving its laudatory objectives. Some of this is the result of coercive court orders, but voluntary action of employers acting in good faith to eradicate the longstanding evils which existed prior to the statute have played a tremendous part in this progress. Here, for instance, we have an employer who was voluntarily taking steps to eliminate racially-discriminatory employment practices long before the Civil Rights Act of 1964 was passed. But in spite of this forward-looking action, defendant is told that it must respond in damages for something which was not even against the law at the time it was done. It may be that this approach will encourage voluntary action and a softening of the racial prejudices responsible for preexisting inequities in employment. With all deference I suggest the contrary as being more accordant with reality. The concept of conciliation which pervades Title VII should also be engrafted on Section 1981. See Young v. International Telephone & Telegraph Co., 438 F.2d 757 (3rd Cir. 1971). Courts should be slow to employ harshly coercive remedies in cases where, as here, there has been an honest effort on the part of an employer to eliminate discriminatory employment practices and no current violation of any law has been found.

I concur in the majority opinion insofar as it rejects plaintiff's Title VII claims and directs retention of jurisdic-

tion of the class action claim for a reasonable time.[8] I respectfully dissent from that part of it which awards plaintiff back pay under 42 U.S.C. § 1981.

---

8. I should say that with respect to the class action aspect of the case I question whether this plaintiff who voluntarily terminated his employment with defendant over six years ago is qualified to represent the class under Rule 23(a) F.R.C.P., but this court has previously found similar changes in a plaintiff's employment status not to moot the case for the class. Graniteville Co. v. EEOC, 438 F.2d 32 (4th Cir. 1971). Other courts have ruled similarly. Tipler v. E. I. duPont de Nemours & Co., 443 F.2d 125 (6th Cir.

1971) ; Johnson v. Georgia Highway Express, 417 F.2d 1122 (5th Cir. 1969).

In view of the express language of 42 U.S.C. § 2000e-5(k) authorizing the award of attorneys fees in the discretion of the court I likewise have some reservations about the court's holding that plaintiff is entitled to attorneys fees as a matter of law. But here again this court seems to have construed the statute to make the award of attorneys fees mandatory. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971).